UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> M. JAY HEROD | 18-cr-10154-DPW |

## M. JAY HEROD'S SENTENCING MEMORANDUM

Jay Herod is a simple man. That is not to say he isn't clever—he is. He is not naive. He is described as a brilliant computer programmer, a great friend and brother.[1] He is also a felon and accepts full-responsibility for his market manipulation of PixarBio stock and lying to the Securities Exchange Commission. He is asking this Court to impose a sentence of three years of probation with the first sixteen months on Home Confinement. This sentence—particularly when combined with the consequences he already faces—will restrict his liberty, permit him to continue to repay victims, deter others from similar offenses, and ensure his rehabilitation.

**The Nature and Circumstances of Jay Herod, Frank Reynolds, and the PixarBio Crimes**

For the first forty years of his life Jay Herod was a good brother, an adventurous student of language and culture, and a happy-go-lucky computer programmer. He supported himself, his sublings, and only aspired to spend time with friends watching

---

[1] The attached letter of his sister, Jeanie Herod, catalogs a lifetime of generosity and integrity.

sports and having a beer. He didn't own a home or a car, but he did learn to speak Spanish and Russian. He held the same job at the Massachusetts Secretary of State for more than a decade.  He was content. He was known to be generous and supportive; there was no sign of avarice or deceit in any part of Jay Herod's life or relationships. Then he answered a Craigslist ad for a roommate.

Like others in the parade of co-defendants, witnesses, and victims this Court has heard, Jay Herod was enthralled by Frank Reynolds. Mr. Reynolds's unique combination of largesse and hubris easily overwhelmed Mr. Herod's simpler approach to life and human interaction. Mr. Reynolds claimed he was an graduate of the finest schools, a prolific inventor, and had cured his own paralysis.  On the first day of their introduction, Mr. Reynolds began his deceit and quickly convinced Mr. Herod of his greatness.  While previously content to just work and be social, Mr. Herod soon viewed himself as something more substantial and interesting, a biotech investor: a self-taught expert in the efficacy of clinical trials and regulatory process of FDA approval. Watching Mr. Reynolds on CNBC, listening to MIT fellows, and regularly dining with PhDs in Mr. Reynolds' employ only confirmed his growing confidence that he had met a transformative figure and was fortunate to be along for the ride.  Mr. Herod invested his life savings in Invivo Therapeutics at Mr. Reynolds' request and more than tripled his money. When Reynolds asked for all of his money again—this time for PixarBio—he jumped at the chance.

It is now clear that Mr. Herod was among many "friends and family" that were the subject of Mr. Reynolds' slow grift through his relentlessly grandiose promises. By

2

the time Mr. Reynolds presented PixarBio to Mr. Herod, the deception was complete. Mr. Herod believed Mr. Reynolds could cure and had cured paralysis. He believed Mr. Reynolds could solve the opioid crisis. He also believed that by manipulating the price of PixarBio, he was playing a role in the creation of a company that would improve lives.

When shares of PixarBio started trading exactly as Mr. Reynolds predicted, Mr. Herod believed he had become a millionaire overnight. It is hard to overstate the intoxicating effect of instant wealth for someone with Mr. Herod's background. Nor is it hard to imagine both the sense of obligation one might feel for the founder of that feast and the resulting willingness to do as told or even to lie to protect him.

To be clear, greed was an undeniable factor in Mr. Herod's market manipulation. He repeated his efforts to manipulate the price of the stock several times. But Mr. Herod's actual conduct is more consistent with being a true-believer than that of someone trying to take investors' money while giving them nothing in return. He sold shares at the direction of Mr. Reynolds[2] and with the imprimatur of lawfulness that came with the involvement and legal opinion letters of attorneys Alan Fraade and Fred Mintz—attorneys he paid and trusted despite their troubling conflicts.[3] Mr. Herod broke the law, and he knew it. But this was, in his view, a temporary evil necessary to assist Mr. Reynolds in building a lasting company with an important product.

---

[2] The testimony at trial and supported by various exhibits shows that most of Mr. Herod's stock sales occurred only after he had already obligated himself to deposit that money back into PixarBio. In fact, before the first day of trading, Mr. Herod was convinced to invest the first $200,000 of his future sales back into PixarBio.

[3] Now disbarred, Attorneys Fraade and Mintz are currently co-defendants in the parallel SEC action pending before Judge William Young (18-cv-10797-WGY).

Mr. Herod's use of the proceeds of his sales is very telling. He didn't hide the money or spend it lavishly. Instead, consistent with his belief in the legitimacy of PixarBio and Frank Reynolds, he immediately reinvested the proceeds of his stock sales into the company and its founder's legal battle with InVivo. These facts can only evidence his genuine belief that PixarBio was an actual company with an important product and bright future. If Mr. Herod were aware that Mr. Reynolds was lying about PixarBio's products or financial stability, he would not have invested his life savings in the company. If Mr. Herod had believed they were fleecing investors and absconding with their money, he wouldn't have instantly returned nearly all of the proceeds of his sales to their company and its founder.

Mr. Herod has already accepted many consequences of his crime and resulting conviction. He pleaded guilty. He confessed his crimes to the United States and this Court, and he testified at trial. He also lost his job, his close friends, his good name, and his life savings. As he shares with this Court in his letter, he holds himself personally accountable for the economic and collateral suffering of the victims of PixarBio, even those whom he did not induce to become investors. He will be facing the financial consequences of his crime for the rest of life. In addition to any fine or restitution (his plea agreement contemplates forfeiture of $120,000), he likely owes much more: the SEC is still suing him, and one former friend that blamed him for the downfall of PixarBio secured a default judgment in Massachusetts Superior Court against him for more than $220,000.[4]

---

[4] The plaintiff in that action, David Kazis, is familiar to the Court as someone who engaged in insider trading based on non-public information he received from Mr. Herod about Mr. Reynolds's impending

Mr. Herod requests that this Court impose a sentence that is sufficient but not longer than necessary to accomplish the purpose of sentencing—a sentence of probation for three years, with the first sixteen months as home confinement. During this time, Mr. Herod will continue at his current employer and begin making the necessary economic reparations to the victims of his actions. By restricting his liberty, this Court punishes Mr. Herod's conduct and eliminates his treasured ability to travel and socialize with friends over beer and sports, while maintaining his ability to make financial amends.  Incarceration would result in deeper economic ruin without any obvious means for him or his victims to recover. Incarceration would therefore not assist victims and would undermine Mr. Herod's rehabilitation.

**The Guidelines**

The only guideline calculation in dispute is the government's calculation (or lack thereof) of loss amount. It is otherwise agreed that Mr. Herod's criminal history score is zero; he pleaded guilty to an obstruction related offense and therefore doesn't dispute the two-point adjustment for obstruction; he promptly accepted responsibility and signed a plea agreement. That agreement limits his ability to argue the appropriate guideline calculations, but he did reserve his right to dispute the loss amount enhancement of 14 points and to instead argue that a 12-point enhancement is fairer and more accurate. Consistent with his plea agreement, Mr. Herod suggests that a

---

departure from InVivo. Mr. Herod's status as witness for the United States and a defendant in this matter limited his ability to reply to the inaccurate information alleged in that lawsuit. Despite this, Mr. Kazis successfully defaulted Mr. Herod and obtained a judgment that more than triple his actual loss.

5

proper determination of his guideline range, before consideration of the downward departure sought in the government's motion pursuant to 5K1.1, results in a Criminal History Category of I and an adjusted offense conduct score of 21 (7 base, plus 12 for loss amount, plus 2 for obstruction), with a final Offense Level of 18 (after acceptance deductions). As such, his Guideline Sentencing Range before downward departures should be 27–33 months.

**Loss Amount**

The Pre-Sentence Report ("PSR") correctly states that the guideline for 15 U.S.C. § 78j(b) offenses are found in USSG 2B1.1 and provides for a base offense level of seven. The PSR further calculates that the offense level should be increased by fourteen points pursuant to USSG 2B1.1(b)(1)(H) for a loss/gain amount of $910,000. This might be a correct statement of the guidelines, but as discussed below, it is not as simple as proposed. The reality is that the actual loss attributable to Mr. Herod's specific conduct is perhaps a solvable equation, but the SEC and government (who has the burden to the prove loss amount they allege) has not provided that data to this Court or Mr. Herod. Thus, the Court should likely employ the alternative means of calculating loss by starting with his "gain".

Even if the Court utilizes "gain" as "loss," the total stock sales of Mr. Herod dramatically overstates the actual loss amount attributable to his criminal conduct. Finally, even if this Court determines that the total stock sales of $910,000 are a "gain" and thus a useful alternative "loss amount" for purposes of increasing his offense

conduct score, this Court should downward depart from that score because it substantially overstates the seriousness of Mr. Herod's offense. See USSG 2B1.1, note 21.

**Guideline Loss Calculations**

The PSR (and the government) takes an attractively simple approach to loss by recasting the total stock sales of Mr. Herod as "gain." Proper guideline calculation, however, does not permit such a simplistic view. The "[g]eneral [r]ule [is that] loss amount is the greater of actual loss or intended loss." Note 3(A). Only if actual loss cannot be determined can this Court elect "gain" as an alternative method of establishing loss. *See* Note 3(B) ("the court shall use gain that resulted from the offense as alternative measure of loss only if there is a loss, but it reasonably cannot be determined."). Consequently, what may seem like linear and logical guidance contained in the Application Notes to 2B1.1 to calculate loss amount in fact creates many challenges to account for the loss amount in Mr. Herod's case.

**Actual Loss**

Actual loss means "reasonably foreseeable pecuniary harm that resulted from the offense," and " 'Intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict…" §2b1.1, note 3.

The facts upon which Mr. Herod pled guilty are that beginning about November 1, 2016 until the last week of December, he sold shares at the direction of a restricted person (Frank Reynolds). While his early shares were largely governed by market price, it is clear that beginning on day one and continuing into December 2016, some

portion of his trades were at prices intended to inflate the perceived value and interest in PixarBio. But there is nothing unlawful about asking a higher price for your shares than the market has offered. There is also nothing unlawful if an arm's length purchaser meets that higher price, as it most certainly was in the early days of (heavy) trading by Mr. Herod. That said, no clearer evidence of his criminal intent can be found than in his attempts to purchase 100 shares of PixarBio at prices higher than the market was commanding.

There is no dispute that eventually (in December) Mr. Herod began placing small trade orders designed to artificially increase the market price. Often these trades were executed at the end of the day, resulting in an overnight price that was not a true market price. It is not clear from the evidence at trial, the statements of government at Mr. Herod's plea, or in discovery, what discrete impact this conduct had in creating actual loss to investors.

Mr. Herod was unaware of Mr. Stromsland's unlawful trading, and he was oblivious to the lies of Frank Reynolds. It is undisputed that Mr. Herod was unaware of the precarious financial status of PixarBio or that Mr. Stromsland (and perhaps others) engaged in a similar pattern of manipulative trading.[5]

The fact that investors bought shares at an inflated price might inspire the Court to simply determine the net difference between the market price and Mr. Herod's higher price as the loss amount. But that calculus would require information about the volume of trading that we do not have. Even if that amount were reachable and

---

[5] To the contrary, Mr. Herod was led to believe he was the only person able to freely trade PixarBio among those involved in the early days of PixarBio.

8

determined, it should only include those investors inveigled to invest by the upward trend in volume or market price. If the Court could determine that figure, which is likely impossible without the government providing that information, it should still further restrict the actual loss by any market sales by those specific investors determined to have been misled by Mr. Herod's trading. From that remainder, the Court could reduce any amounts by investments made after the publicly disclosed SEC concerns about PixarBio. The final figure would also require more subtraction should occur for any trades by others with 'unclean hands' (i.e. Stromsland).

Lastly, and importantly if the Court seeks to calculate actual loss, the loss must have been foreseeable. See §2b1.1, Note 3, *United States v. Mallory*, 709 F. Supp.2d 455 (2010). In order to hold these losses against Mr. Herod in the sentencing context, the Court must agree that they were foreseeable by him—who at the time was oblivious to the house of cards that was PixarBio and who was not entirely reckless in that conclusion. After all, outside securities lawyers had endorsed his ability to trade, analysts and media had reported Mr. Reynold's promises as gospel, and scientists and experts were rapidly joining the PixarBio team. Mr. Herod could not have *foreseen* any loss attributable to his conduct. Mr. Herod's testimony and conduct only corroborate his belief that all who invested with Pixar were about to become very wealthy.

These standards seem unworkable and cannot be determined with reasonable certainty. But the Guidelines are not blind to the challenges presented by market manipulation in a traditional calculation of actual or intended loss. As such, the Note 3(F)(ix) specifically instructs that:

> *Fraudulent Inflation or Deflation in Value of Securities or Commodities.* — *In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by —*
>> *(I)   calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and*
>> *(II)  multiplying the difference in average price by the number of shares outstanding.*

Here, the Court could calculate the average price from from November 1, 2016 to December 31, 2016 (the 'period that the fraud occurred'). Likewise, it could probably ascertain the average price during the 90 day period after the fraud was disclosed to the market (probably the January 23, 2017 trading freeze by the SEC). But even without that information, this Court can reach the final dictate of this section of the guidelines to agree that this amount would overstate loss:

> *In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).*

Here, there can be little dispute that Mr. Herod's market manipulation was not the cause of the demise of PixarBio. The drastic reduction in the market price of PixarBio did not spring from the revelation that, in November and December 2016, the market price was inflated by Mr. Herod's sales decisions or his price altering attempts

10

with 100-share trades. Instead, the loss is a consequence of Mr. Reynolds' misrepresentations to the public about the significance of Neurorelease, Mr. Reynolds' false statements about the timeline to (and likelihood of) FDA approval, and his false statements about PixarBio's financial status. As such, the methodology outlined in this section of the Guideline notes would, if deployed, almost certainly dramatically overstate the seriousness of the offense and require downward adjustment.

**Intended Loss**

'Intended loss' is even harder to calculate, but less necessary to attempt. Starting from the undisputed notion that Mr. Herod believed PixarBio was going to end the opioid crisis and had invested his own life savings, and adding the reality that he reinvested nearly all the proceeds of his sales (in fact, most sales post-dated a legal commitment to reinvest the money in PixarBio), this Court cannot conclude that Mr. Herod "*purposely sought to inflict*" to any investor.

Because the government has the burden to prove *actual* and *foreseeable* losses attributable to Mr. Herod's wrongful conduct, he could argue that this Court has a basis to determine that losses are zero. He doesn't not make that request because, like the government's suggested outcome, that would be unfair and incorrect. Instead, this Court could simply rely upon Mr. Herod's agreement that the amount of loss is equal to the range resulting in a twelve-point enhancement because the government has failed to prove the figures exceeded $550,000.

**Gain as Loss**

With the lack of necessary information and the inaptness of the application notes regarding actual loss, the Court may choose to deploy "gain" as the loss amount because "the [C]ourt need only make a reasonable estimate of the loss" and the preferred methods of loss calculations (actual or intended) are unworkable and cannot be determined. But if the Court employs "gain" as "loss" amount, $910,000 is only the starting high-water mark.

No one will pretend that Mr. Herod absconded with $910,000.[6] The total can and should be reduced by $500,000. Application Note 3(E) provides that "[l]oss shall be reduced by…(i) The money returned…to the victim before the offense was detected." Here, the investors and victims are shareholders in PixarBio. PixarBio received $500,000 of the $910,000 proceeds of Mr. Herod's stock sales. Although the guidelines might have aimed to provide this relief to someone who abandoned a scheme and made amends before getting caught, that interpretation is not mandated. And because the note is aimed at properly assessing *actual* gain, the Court should acknowledge Mr. Herod's good-faith belief that PixarBio was legitimate. Such a view would permit this Court to view his return of $500,000 to the company as—at bare—not a gain to him.

Alternatively, even if the Court includes that amount in Mr. Herod's "gain," then it must acknowledge that his good-faith investment of his life-savings (nearly $400,000) reduces his pecuniary gain. Simply put, even though Mr. Herod sold $910,000 through his stock sales, his final economic gain is the $510,000 exceeding his own good-faith

---

[6] The PSR and the United both use these rounded numbers which fairly hue to the precise numbers. Mr. Herod adopts this approach as suitable and has no objection to the Court relying on these simpler proxies to specific amounts.

12

investment. This view of gain simultaneiously recognizes the reality of this case—Mr. Herod was a victim and a perpetrator.

## Conclusion

Mr. Herod is a felon that his destroyed his good name. His crimes have victims. He asks this Court to fashion a sentence that permits him to mitigate the damage his has caused. By insisting on Home Confinement for 16 months, this Court limits his liberty while eliminating the economic burden of incarceration of the United States and enabling him to pay what he owes. Jay Herod is a better man as a consequence of his reflection on his crimes and the world is a better place with Jay Herod in it.

                                                    Respectfully Submitted,
                                                    M. JAY HEROD
                                                    By and through counsel

Date: February 18, 2020        */s/ Leonard E. Milligan III*
                                                    Leonard E. Milligan III
                                                    BBO #668836
                                                    MILLIGAN RONA DURAN & KING LLC
                                                    50 CONGRESS STREET, SUITE 600
                                                    BOSTON, MA 02109
                                                    t. 617.395.9493
                                                    lem@mrdklaw.com