UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 18-cr-10154-DPW |
| M. JAY HEROD | |

## M. JAY HEROD'S MOTION TO MODIFY HIS SENTENCE TO IMPOSE HOME DETENTION

*"Over 70% of tested inmates in federal prisons have COVID-19."*

-Headline, AP, April 30, 2020[1]

M. Jay Herod respectfully moves this Court to modify his sentence pursuant to 18 U.S.C. § 3582(c) and his Eighth Amendment rights to allow him to begin serving his sentence in home detention.

## BACKGROUND

On April 24, 2018, Mr. Herod was arrested and charged with securities fraud and obstruction of an agency proceeding. He was released that day. During the period between his arrest and his sentencing on February 20, 2020, he complied with all conditions of his release. He also swiftly and substantially assisted the United States by aiding in its prosecution of his co-defendants—including testifying at trial. At sentencing on February 20, 2020, the Court gave Mr. Herod a thorough and fair opportunity to be heard as to why his suggested sentence of home-confinement was a sufficient sentence. At the hearing, Mr. Herod shared with the Court the introspection he has done since his conviction and the resultant change in his worldview. He has taken this conviction as an opportunity

---

[1] *Over 70% of Tested Inmates in Federal Prisons Have COVID-19*, Michael Balsamo, AP News (last accessed May 4, 2020), https://apnews.com/cf310ab85b403b1ac9b051b3fb086e4e.

for growth and has dedicated himself to contributing positively to his community. Even though the Court viewed his community service aspirations positively, it reasoned that the nature of the crime merited a sentence of six months incarceration. At the time, neither the Court nor counsel could have anticipated the catastrophic changes that would occur in two months since.

Mr. Herod was sentenced to a term of six (6) months imprisonment with three (3) years of supervised release with standard and special conditions; 1,200 hours of community service, and a special assessment of $200. *Judgment In A Criminal Case as to M. Jay Herod*, Dkt. No. 295. The Court ordered Mr. Herod to surrender to the Bureau of Prisons ("BOP") on May 15, 2020, and to call the U.S. Marshalls Service on April 17, 2020 to find out where he would report. *See* Dkt. No. 281. On April 17, 2020, the BOP informed him that he must self-surrender to FCI Berlin on May 15, 2020. Before the COVID-19 public health crisis, Mr. Herod had no intention of challenging his sentence. He was instead prepared to self-surrender on May 15, 2020, as ordered, and was focused on continuing to accept responsibility, move forward, and rebuild his life. At present, Mr. Herod is gainfully employed and working to make amends for his conduct.

Mr. Herod now prays that this court will allow him to serve his sentence in home confinement rather than in a BOP facility. Given the most recent projections, including peak infections, so-called "second waves," there is ample evidence for this court to conclude that the next six months are a perilous and deadly time to be incarcerated and that a modest delay in report date runs counter to CDC guidance about the longevity of this pandemic. The short length of Mr. Herod's sentence combined with the serious health and constitutional dangers of imposing incarceration on him during a global pandemic justify an amendment of his sentence to home confinement. Mr. Herod requests this relief pursuant to and 18 USC § 3582(c) because the COVID-19 pandemic presents unique and important concerns about his health and safety. Any and all §3553 factors should now be viewed through the lens of this epidemic.

**ARGUMENT**

## I.   MR. HEROD SHOULD NOT BE REQUIRED TO SURRENDER TO A FEDERAL PRISON IN THE MIDST OF THE DEADLY COVID-19 PANDEMIC.

Since April 17th, when the BOP informed Mr. Herod that he would report to FCI Berlin on May 15th, the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" has become ever more apparent. *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020). The number of confirmed cases in the country has risen exponentially from only 70 at the beginning of March to over 1,100,000 as of May 1st, and the death toll—totaling over 64,800 as of May 1st—has grown by well over 1,000 each day since early April.[2] Dr. Anthony Fauci, the Director of the National Institute of Allergy and Infectious Diseases, recently declared that it would be a "false statement" to say that the pandemic is under control.[3]

Prisons are particularly ill-equipped to protect inmates and prevent the spread of COVID-19. The virus transmits rapidly in densely populated spaces[4] and the prison environment makes it difficult, if not impossible, to comply with the recommendations of the Centers for Disease Control and Prevention ("CDC") that people keep a six-foot distance from others and avoid gatherings of more than ten people.[5] Reports abound concerning the inability of prisons to separate sick individuals from healthy individuals and to treat the former without endangering the latter—

---

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (last accessed Apr. 23, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[3] *Fauci says it would be 'false statement' to say we have coronavirus under control*, The Hill (Apr. 5. 2020), https://thehill.com/homenews/sunday-talk-shows/491228-fauci-says-it-would-be-false-statement-to-say-we-have-coronavirus.
[4] Jason Pohl, *California jails, prisons on alert for coronavirus. Fear it will 'spread like wildfire*, Sacramento Bee (Mar. 6, 2020), https://www.sacbee.com/news/california/article240962761.html.
[5] Resources for Large Community Events & Mass Gatherings, CDC (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/index.html.

actions that are necessary to mount an effective response to the virus.[6] Top healthcare experts emphasized such concerns recently in a joint letter to President Trump:

> More than 221,000 people are incarcerated in federal prisons. These people are housed cheek-by-jowl, in tightly-packed and poorly-ventilated dormitories; they share toilets, showers, and sinks; they wash their bedsheets and clothes infrequently; and they often lack access to basic personal hygiene items. These facilities lack the ability to separate sick people from well people and to quarantine those who have been exposed. They are tinderboxes, ready to explode and endanger our entire country. Adequate medical care is hard to provide, even without COVID-19.[7]

These concerns echo those of a complaint filed in late March with the Occupational Safety and Health Administration (OSHA) by the Council of Prison Locals 33, a division of the American Federation of Government Employees.[8] The complaint alleged federal prisons to be "proliferating the spread" of COVID-19 "both within our prison system and to our surrounding communities," and alleged such safety hazards as requiring staff who have been exposed to the virus to report for work; continuously moving inmates among prison sites; failing to implement high efficiency air filters or other measures to improve ventilation; and failing to implement social distancing measures. The prison facility to which Mr. Herod was designated, FCI Berlin, is among the complaint's list of "sites affected."[9]

---

[6] *Id.*; *see also* Gabrielle Coppola & Edvard Pettersson, *Americans Most Likely to Be Infected: the Faithful, Jailed or Old*, Bloomberg (Apr. 11, 2020) ("Everyone from Attorney General William Barr to the American Civil Liberties Union sees a crisis brewing among the 2.3 million prisoners in the U.S."); *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, L.A. Times (Mar. 20, 2020), https://www.latimes.com/california/story/2020-03-20/prisondoctors-stark-warning-on-coronavirus-and-incarceration.

[7] Letter to President Trump (Mar. 27, 2020), *available at* https://www.scribd.com/document/454182211/COVID-19-Public-Health-Expert-Letter-to-Trump.

[8] Notice of Alleged Safety or Health Hazards (Mar. 31, 2020), *available at* https://www.afge.org/publication/union-says-failed-response-to-coronavirus-endangering-federal-workers-veterans-communities/.

[9] *Id.* FCC Tucson, in Arizona, the facility at which defendant Toby Macfarlane was incarcerated, is also on the complaint's list of "affected" sites. Indeed, as reported by Mr. Macfarlane, that facility all but ignored the CDC's recommendations, confining him "in a single room with 140 other inmates, sleeping on beds head-to-toe and living in extremely close proximity with his fellows." Mem. Supp. Mot. for Reduction of Sentence, *United States v. Macfarlane*, No. 1:19-cr-10131-NMG, Dkt. No. 349 at 4 (D. Mass. Apr. 10, 2020).

Recognizing the serious risks posed by COVID-19 outbreaks in prisons, the Department of Justice ("DOJ") has begun urging the BOP to release inmates to safer home detention environments. On March 26, 2020, Attorney General William Barr sent a memorandum to the Director of the BOP requesting that the BOP use its existing statutory authority to release certain inmates to home confinement.[10] Observing that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities,"[11] Attorney General Barr provided the BOP with criteria to be used in making its release determinations. Those criteria included, among other factors, "[t]he age and vulnerability of the inmate to COVID-19"; "[t]he security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities"; "[t]he inmate's score under [the BOP's risk assessment tool used to predict recidivism]"; "[w]hether the inmate has a demonstrated and verifiable re-entry plan," including whether he would face a lower risk of contracting COVID-19 upon release than he would face in his BOP facility; and "[t]he inmate's crime of conviction, and assessment of the danger posed by the inmate to the community."[12]

On April 3, 2020, Attorney General Barr released a second memorandum to the Director of the BOP. Exercising the authority granted to him by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act enacted on March 27, 2020, the Attorney General made a "finding that emergency conditions are materially affecting the functioning of the [BOP]" and ordered the BOP to "move with dispatch" to expand the group of prisoners eligible for release into home

---

[10] *See* Memorandum for Director of BOP, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020),  available at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77- fda671420000.
[11] *Id.*
[12] *Id.*

confinement.[13] The BOP has since "begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC . . . to determine which inmates are suitable for home confinement."[14] Though the BOP is prioritizing review of those inmates at three prisons that have been reported to have particularly serious outbreaks, it has emphasized that it is "urgently reviewing all inmates" using the criteria set forth in the Attorney General's March 26th memorandum.[15] As of April 23, 2020, the BOP had released 1,440 prisoners from BOP custody pursuant to these directives.[16] One minimum-security camp in New York, at FCI Otisville, recently began moving the majority of its inmates into quarantine at the adjoining medium security prison in preparation for potential release or furlough.[17] The BOP has also implemented internal measures in an effort to help contain the virus, such as isolating all symptomatic inmates, suspending most internal inmate movement, and suspending all visits—including legal visits, except as allowed on a case-by-case basis.[18]

Courts across the country have also increasingly begun to recognize the urgent need to reduce the jail population and the potentially catastrophic effects that prison outbreaks could have on both prison populations and the society at large. These concerns have prompted a spate of rulings granting or extending the release of individuals who are detained, incarcerated, or soon scheduled to self-surrender.  *See, e.g.*, *United States v. Macfarlane*, No. 1:19-cr-10131-NMG, Dkt. No. 352 (D. Mass. Apr. 14, 2020) (holding that the pandemic and other factors constitute

---

[13] Memorandum for Director of BOP, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), *available at* https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.
[14] *Update on COVID-19 and Home Confinement*, Bureau of Prisons (Apr. 5, 2020), at https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.
[15] *Id.*
[16] *COVID-19 Home Confinement Information*, BOP.gov (last accessed Apr. 23, 2020), https://www.bop.gov/coronavirus/.
[17] *See Michael Cohen Is Among Prisoners to Be Released Because of Virus*, N.Y. Times (Apr. 17, 2020), https://www.nytimes.com/2020/04/17/nyregion/michael-cohen-release-prison-otisville-virus.html.
[18] *See Federal Bureau of Prisons COVID-19 Action Plan*, BOP.gov, https://www.bop.gov/resources/news/20200313_covid-19.jsp.

"extraordinary and compelling circumstances which warrant a reduction in [the defendant's] sentence"); *Savino v. Hodgson*, No. 1:20-cv-10617-WGY, Dkt. Nos. 55, 73, 76, 86 (D. Mass. Apr. 7, 2020) (releasing ICE detainees due to pandemic); *United States v. Foster*, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020) (reducing sentence for "extraordinary and compelling" reasons caused by virus); *United States v. Williams*, No. 3:04-cr-95, Dkt. No. 91 (N.D. Fla. Apr. 1, 2020) (same); *United States v. Selna*, 8:16-cr-76-JVS, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) (noting that "the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); *United States v. Harris*, No. 19-cr-356, Dkt. No. 35 (D.D.C. Mar. 26, 2020) (observing that "incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement"); *Xochihua-James v. Barr*, 798 F. App'x 52 (9th Cir. Mar. 23, 2020) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *Stephens*, 2020 WL 1295155, at *3–4 (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *United States v. Huneeus*, No. 19-cr-10117, Dkt. No. 642 (D. Mass. Mar. 17, 2020) (granting release based on "extraordinary and compelling reasons"); *United States v. Barkman*, No. 3:19-cr-0052-RCJ-WGC, 2020 WL 1811343 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because of the "direct risk" posed by the pandemic); *United States v. Raihan*, No. 20-cr-68, Dkt. No. 20 (E.D.N.Y.

Mar. 12, 2020) (noting that "[t]he more people we crowd into [a] facility, the more we're increasing the risk to the community").

Unfortunately, these combined efforts have yet to prevent the spread of COVID-19 within federal prisons. The number of confirmed COVID-19 cases in federal prisons has grown exponentially since the first federal inmate was confirmed to test positive for COVID-19 on March 21st.[19] By May 1st, the BOP reported that it had 1842 prisoners and 343 staff members with confirmed positive test results for COVID-19.[20] It has also reported thirty-six inmate deaths due to the disease. Even assuming some areas of the country are beginning to "flatten the curve," the percentage increase of confirmed COVID-19 cases within BOP facilities has continued to rise at an alarming rate:[21]



---

[19] *First Federal Inmate Tests Positive for Coronavirus, AP Reports*, Bloomberg (Mar. 21, 2020), https://www.bloomberg.com/news/articles/2020-03-21/ap-exclusive-1st-fed-inmate-tests-positive-for-coronavirus.
[20] *See COVID-19 Cases*, BOP.gov (last accessed Apr. 23, 2020), https://www.bop.gov/coronavirus/.
[21] *COVID-19 Cases*, BOP.gov, bop.gov/coronavirus/index.jsp (updated daily and last visited Apr. 14, 2020); *Coronavirus Disease 2019*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 14, 2020).

Even more concerning, the cases reported by the BOP almost certainly underestimate the true number of infections due to inconsistent testing,[22] delays in reporting,[23] and the presence of asymptomatic inmates and staff.

Mr. Herod is almost 54 years old and therefore within the category of individuals considered to be at high risk of severe illness or death from the virus. He poses no danger to the public, nor is he likely to recidivate. His PATTERN score would be a -12, well within the eligibility guidelines for release to home confinement issued by Attorney General Barr. To compel Mr. Herod to surrender to a federal prison in the midst of this pandemic—during a time when the Attorney General, the BOP, and courts across the country are fervently working to *release* prisoners with similar risk profiles—would not only unnecessarily endanger Mr. Herod's life, but also wholly undermine these critical efforts to reduce the prison population in a safe and effective manner. In fact, Mr. Herod's additional presence at his designated facility would only further compound the difficulties the facility faces in complying with the CDC's social distancing and hygiene recommendations, thereby increasing the already grave risks faced by the current prison population, staff, and individuals in the numerous communities in which these staff return home to.

Against this backdrop, there is simply no reason to subject Mr. Herod, in just over two weeks, to the potentially life-threatening conditions of a federal prison. *See United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now

---

[22] *See, e.g.*, *No COVID-19 tests available for prisoners at center of New York outbreak, court documents show*, ABC News (Apr. 4, 2020), https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077.

[23] *Compare* Letter from M. Licon-Vitale, MCC New York Warden, and D. Edge, MDC Brooklyn Warden, to the Hon. Roslynn R. Mauskopf (Apr. 7, 2020) *available at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (reporting 3 positive inmates at MDC Brooklyn) *with COVID-19 Cases*, BOP.gov (Apr. 7, 2020), www.bop.gov/coronavirus (reporting 2 positive inmates at MDC Brooklyn).

it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided.").

## II.      THE COURT SHOULD ALLOW MR. HEROD TO BEGIN SERVING HIS SENTENCE IN HOME DETENTION.

Though the Court may be inclined to address the dangers posed by the COVID-19 pandemic by continuing Mr. Herod's self-surrender date, Mr. Herod respectfully requests that this Court allow him to begin serving his sentence in home detention.

The significant risks posed by the pandemic are unlikely to subside for months or even over a year.[24] Even if society brings the pandemic under control for a time, there are likely to be recurring waves of COVID-19 infections—and CDC Director Robert Redfield has warned that the second wave is likely to be even more devastating than the first.[25] Further, while some states have already begun taking steps to return to normalcy, Dr. Fauci has warned that such efforts will "backfire."[26] Dr. Deborah Birx, the White House's coronavirus response coordinator, has agreed that relaxing social distancing efforts too soon could result in a "very acute second wave."[27] The successive waves of the virus and any missteps in containing it will all but ensure that "[t]here will be no quick return to our previous lives";[28] rather, the virus will remain "a lingering part of

---

[24] *See* Ed Yong, *How the Pandemic Will End*, The Atlantic (Mar. 25, 2020), https://www.theatlantic.com/health/archive/2020/03/how-will-coronavirus-end/608719.
[25] *CDC director warns second wave of coronavirus is likely to be even more devastating*, The Washington Post (Apr. 21, 2020), https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.
[26] *Three Southern states move to reopen businesses amid coronavirus crisis as experts warn of possible 'backfire'*, L.A. Times (Apr. 20, 2020), https://www.latimes.com/world-nation/story/2020-04-20/coronavirus-protests-reopening-phase-trump.
[27] *Dr. Birx warns of 'very acute second wave' of coronavirus infections if social distancing measures are relaxed*, Business Insider (Apr. 8, 2020), https://www.businessinsider.com/birx-warns-of-very-acute-second-wave-of-coronavirus-infections-2020-4.
[28] *The Coronavirus in America: The Year Ahead*, N.Y. Times (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/health/coronavirus-america-future.html.

American life for at least a year, if not much longer."[29] As Dr. Fauci has cautioned with respect to the length of the outbreak, "the virus makes the timeline."[30]

Wholly apart from any further projected waves of the virus, experts broadly agree that the pandemic will be fully contained only "when enough people have become immune to the virus, either through having been infected with it or through the development of a vaccine that provides effective immunity."[31] The eventual development of such a vaccine, however, is far from certain: researchers have worked for years to develop vaccines for other viruses without success.[32] Even if a safe and effective vaccine is ultimately developed, approved, and distributed, Dr. Fauci has estimated that this process would take *at least* twelve to eighteen months.[33] Some experts believe vaccine development will take even longer, criticizing the twelve-to-eighteen month timeframe as "extraordinarily fast" and "ridiculously optimistic."[34]

Simply continuing Mr. Herod's surrender date until the pandemic is contained is thus an untenable solution.  Doing so will likely result in Mr. Herod waiting for over a year to begin serving his six-month sentence, and it would similarly delay the *completion* of his sentence and the opportunity for Mr. Herod to begin rebuilding his life. To prevent Mr. Herod from moving forward with his life for this length of time, while simultaneously forcing him to live with the burden of his looming imprisonment, would be to impose a significant punishment separate and apart from the

---

[29] Yong, *supra* note 24.

[30] *Fauci: 'You don't make the timeline. The virus makes the timeline'*, The Hill (Mar. 26, 2020), https://thehill.com /policy/healthcare/489636-fauci-you-dont-make-the-timeline-the-virus-makes-the-timeline.

[31] *COVID-19 Is Here. Now How Long Will It Last?*, Yale School of Medicine (Mar. 27, 2020), https://medicine. yale.edu/news-article/23446/.

[32] *Coronavirus Vaccine in 18 Months? Experts Urge Reality Check*, Bloomberg.com (Mar. 31, 2020), https:// www.bloomberg.com/news/articles/2020-03-31/coronavirus-vaccine-is-coming-in-a-year-to-18-months-show-me. [33] *The Coronavirus in America: The Year Ahead*, *supra* note 28; Yong, *supra* note 24.

[34] *Coronavirus Vaccine in 18 Months? Experts Urge Reality Check*, *supra* note 32; *The timetable for a coronavirus vaccine is 18 months. Experts say that's risky*, CNN.com (Apr. 1, 2020), https://www.cnn.com/2020/03/31/us/ coronavirus-vaccine-timetable-concerns-experts-invs/index.html.

sentence this Court already imposed. Just as he had the right to be sentenced "without unnecessary delay" pursuant to Federal Rule of Criminal Procedure 32(b), so too should he be able to begin serving his sentence within a reasonable period of time. *Cf. United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("[W]e see no reason to depart from the majority view that assumes that the Sixth Amendment also protects against post-trial delay.").

Moreover, Mr. Herod is exactly the type of individual that the BOP *is in the very process of releasing* to home detention. Mr. Herod meets every one of the Attorney General's criteria for release: he is over fifty and thus in the category of "more vulnerable" individuals; he is designated to a medium security facility with a minimum security camp; he has little to no risk of recidivism; he would be released to his home, where he would indisputably be at lower risk of contracting COVID-19 than in a prison; and he poses no danger whatsoever to the community. Yet Mr. Herod cannot obtain such relief from the BOP directly because he has not yet surrendered to a BOP facility—a fact confirmed by the recent experience of defendant Michelle Janavs, who sent a request to the warden of her designated facility and was told that "because [she] is not yet in custody, the BOP would not move for a sentencing modification on her behalf."[35]

For Mr. Herod to surrender to his designated facility, even if only for the purpose of being released, would entirely negate the purpose of obtaining such relief. Not only could the BOP's review process take weeks,[36] but pursuant to current BOP policy, once the BOP identifies him as

---

[35] *See* Janavs' Mot. Modify Sentence, Dkt. No. 1098; *see also United States v. Jepsen*, No. 3:19-cv-73(VLB), 2020 WL 1640232, at *2 (D. Conn. Apr. 1, 2020) (noting that the defendant "requested release from the BoP directly, but the BoP's senior counsel . . . denied the request because [defendant] is not incarcerated at a BoP facility"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, Dkt. No. 834 (E.D. Wash. Mar. 31, 2020) (observing that the BOP told the defendant's counsel "that because Defendant was not yet in a designated facility, there was no one able to process her request" for release).

[36] *See, e.g.*, *United States v. Skelos*, No. 15-CR-317 (KMW), 2020 WL 1847558, at *1 (Apr. 12, 2020) (noting that, as of April 12, "the BOP has not taken any action on" the defendant's release application made on March 26); *United States v. Knox*, No. 1:15-cr-00445-PAE, Dkt. No. 1084 (S.D.N.Y. Apr. 8, 2020) (noting that, in her declaration to the court, a BOP attorney was "unable to commit to resolving" the defendant's release application by any particular date, or even to commit to "whether that decision will be made within 30 days . . . of that

a candidate for release, Mr. Herod would undergo a mandatory fourteen-day quarantine.[37] Because

minimum security camps (of which Mr. Herod's designated facility is one) do not have the

capacity to implement such quarantines, Mr. Herod would be moved to a higher security prison for

the duration of the quarantine.[38] There, Mr. Herod would be quarantined with multiple other

inmates set for release, and if any other inmate in his quarantine group were to test positive for the

virus during the quarantine, the BOP would reset Mr. Herod's fourteen-day clock—potentially

more than once.[39] Given this approach, which one federal judge in the Southern District of New

York recently referred to as "Kafkaesque,"[40] Mr. Herod would likely spend at least a few weeks in

two different facilities before obtaining relief—thus overwhelmingly realizing his fear of exposure

to the virus.

The Court could avert this dangerous route to relief by modifying Mr. Herod's sentence to

allow him to start serving it in home detention under 18 U.S.C. § 3582(c).  This statute, as recently

amended by the First Step Act of 2018, provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of
> the defendant after the defendant has fully exhausted all administrative rights to
> appeal a failure of the Bureau of Prisons to bring a

---

application"). The continuous increase in the number of inmates approved for home confinement since the release of
the Attorney General's guidance also suggests that many inmates have waited weeks to be so approved. *Compare
Bureau Of Prisons Moving Minimum Security Inmates To Isolation For Release Preparation*, Forbes (Apr. 11,
2020), https://www.forbes.com/sites/walterpavlo/2020/04/11/bureau-of-prisons-moving-minimum-security-inmates-
to-isolation-for-release-preparation/#36d293714ca6 (reporting 886 inmates released to home detention as of April
11) *with COVID-19 Home Confinement Information*, BOP.gov, https://www.bop.gov/coronavirus/ (reporting 1,440
inmates released to home detention as of April 23).

[37] *See Frequently Asked Questions regarding potential inmate home confinement in response to the COVID-19
pandemic*, BOP.gov (last accessed Apr. 22, 2020), https://www.bop.gov/coronavirus/faq.jsp#hc_quarantine ("[P]rior
to transfer to home confinement, all inmates must be quarantined at an appropriate BOP facility for 14 days.").

[38] *See, e.g.*, *Macfarlane*, No. 1:19-cr-10131-NMG, Dkt No. 349 at 5 (explaining that the BOP told defendant's
counsel "that because [defendant's minimum security camp] had no facilities for such a quarantine, [defendant] had
been transferred to . . . a high security facility where he would be housed in a 10 foot by 8 foot cell, possibly with
another 'quarantined' inmate"); *Michael Cohen Is Among Prisoners to Be Released Because of Virus*, *supra* note 17
(reporting that BOP officers recently "began moving the majority of the inmates in [a minimum security camp] . . .
into the medium-security prison in anticipation of possible release into home confinement").

[39] *See United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020)
(explaining that, "[u]nder the BOP's policy, if any one of the individuals in [defendant's] unit . . . tests positive, the
14-day waiting period for *all* inmates in the unit starts anew" (emphasis in original)).

[40] *Id.*

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . if it finds that . . . extraordinary and compelling reasons warrant such a reduction[.]

18 U.S.C. § 3582(c)(1)(A)(i); *see also* Pub. L. No. 115-391, 132 Stat. 5194 (2018). Prior to the

passage of the First Step Act, Section 3582(c) authorized courts to reduce sentences for

"extraordinary and compelling reasons" only upon a motion from the Director of the BOP. In

amending this provision to allow courts to resentence upon a defendant's motion, Congress

intended to "increas[e] the use and transparency of compassionate release," 132 Stat. 5239, while

accounting for the fact that the BOP is typically "best situated to understand an inmate's health and

circumstances relative to the rest of the prison population," *United States v. Perez*, No. 17-cr- 513-3

(AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020).

The unprecedented and protracted health crisis posed by the COVID-19 pandemic, together

with Mr. Herod's particular vulnerability due to his age, provide the requisite "extraordinary and

compelling reasons" to justify such an action. *See, e.g.*, *United States v. Tran*, Case No. CR 08-

00197-DOC, Dkt. No. 405 (C.D. Cal. Apr. 10, 2020); *United States v. Hernandez*, No. 18 Cr. 834-

04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *United States v. Edwards*, No. 6:17-

cr-00003, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020); *United States v. Rodriguez*, No. 2:03-

cr-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *United States v. Muniz*, No.

4:09-CR-0199-1, 2020 WL 1540325 (KPE), at *1–2 (S.D. Tex. Mar. 30, 2020); *United States v.

Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829 (LGS), at *3 (S.D.N.Y. Mar. 27, 2020).

Indeed, this Court recently came to a similar conclusion in granting release under Section

3582(c) for defendant Toby Macfarlane. The Court found that "extraordinary and compelling

circumstances" exist in light of "1) the COVID-19 pandemic and the national emergency declared

by the President of the United States; 2) the particular risk of infection and transmission risk in

-15-

penitentiary facilities; 3) the fact that the defendant is a non-violent first-time offender who does not pose a danger to the community; and 4) the fact that he has been (and will be for the next week) subject to a quarantine in solitary confinement at a higher security facility."  Mem. & Order, *United States v. Macfarlane*, No. 1:19-cr-10131-NMG, Dkt. No. 352 (D. Mass. Apr. 14, 2020). Each of these considerations is equally relevant to Mr. Herod, with the exception that Mr. Herod has not yet been subject to a quarantine in solitary confinement.  Such a quarantine would be all but certain, however, if Mr. Herod were to surrender to FCI Berlin on May 15th.

Though Mr. Herod has not exhausted his remedies under the statute, the Court should waive the exhaustion requirement or deem it satisfied because, unlike Mr. Macfarlane, Mr. Herod is *unable* to exhaust his administrative remedies. In such circumstances, and considering the potential harm caused by exhaustion here, doing so would comport with congressional intent as well as the ongoing efforts to contain the pandemic.

As an initial matter, Section 3582(c)'s exhaustion requirement is not jurisdictional. The Supreme Court has advised that a rule is jurisdictional only if "Congress has clearly state[d]" that it is. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). The language of Section 3582(c)(1) does not reference jurisdiction, and at least one circuit to consider a related subsection has implied it not to be jurisdictional. *See United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013). Rather, the exhaustion requirement is in the nature of a "claims-processing rule," which "seek[s] to promote the orderly progress of litigation by requiring parties to take certain procedural steps at specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). The requirement "simply delineates the process for a party to obtain judicial review, not referring to the adjudicatory capacity of courts." *United States v. Haney*, No. 1:19-cr-541  (JSR),

2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020). As a result, this Court presently has

jurisdiction to modify Mr. Herod's sentence.

The Court also has the authority to waive compliance with the exhaustion requirement.

Courts have long held that judicially created exhaustion requirements may be excused in certain

circumstances.  *See McCarthy v. Madigan*, 503 U.S. 140, 146–49 (1992); *Washington v. Barr*, 925

F.3d 109, 118–19 (2d Cir. 2019). Where an exhaustion requirement is imposed by statute, the

determination of whether courts may excuse the requirement depends on congressional intent.

*McCarthy*, 503 U.S. at 144. As one court has explicitly concluded in the context of the COVID- 19

pandemic, Congress cannot have intended this exhaustion requirement "to rigidly apply in the

highly unusual situation in which the nation finds itself today":

> Indeed, anyone familiar with the multiple demands that the BOP has faced for many
> years in this era of mass incarceration can reasonably infer that Congress recognized
> that there would be many cases where the BOP either could not act within 30 days on
> such a request or, even if it did act, its review would be superficial. Congress was
> determined not to let such exigencies interfere with the right of a defendant to be
> heard in court on his motion for compassionate release, and hence only limited him to
> 30 days before he could come to court in the ordinary course. Thus, the reduction of
> the wait period to a mere 30 days also "unquestionably reflects" a third purpose, <u>i.e.</u>,
> "congressional intent for the defendant to have the right to a meaningful and prompt
> <u>judicial</u> determination of whether he should be released.

*Haney*, 2020 WL 1821988, at *3 (emphasis in original) (quoting *United States v. Russo*, No. 16-

cr-441 (LJL), 2020 WL 1862294, at *1 (S.D.N.Y. Apr. 3, 2020)). Enforcing the exhaustion

requirement in the current environment would thus undermine Congress's clear purpose to

accelerate judicial review where the BOP cannot or will not act on a request in a reasonable

timeframe.

Courts across the nation have agreed by waiving Section 3582's exhaustion requirement as

futile, incapable of granting adequate relief, or as creating undue prejudice in light of the dangerous

and rapid spread of the pandemic. *See, e.g.*, *United States v. Ben-Yhwh*, CR. NO. 15-00830 LEK, 2020 WL 1874125, at *3 (D. Hawaii Apr. 13, 2020); *United States v. Zukerman*, No. 1:16-cr-194-AT, 2020 WL 1659880, at *2–3 (S.D.N.Y. Apr. 3, 2020); *United States v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020); *Perez*, 2020 WL 1546422, at *2–3; *United States v. Powell*, No. 1:94-cr-00316 (ESH), 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020).

These same reasons weigh in favor of waiving the exhaustion requirement here.  Because the BOP will not consider the release of individuals who have not yet surrendered, Mr. Herod cannot exhaust his remedies with the BOP until first reporting to prison, submitting to the BOP's standard admission procedures, and then waiting in increasingly dangerous conditions for the BOP to approve or deny his eligibility for release to home detention. Here, where "even a few weeks' delay carries the risk of catastrophic health consequences," requiring Mr. Herod to exhaust the BOP's administrative processes would be futile and would render any ultimate relief—release after a long period of potential exposure to the virus—severely inadequate. *Zukerman*, 2020 WL 1659880, at *3.

Mr. Herod is separately entitled to consideration of his motion on the merits because he has effectively satisfied the prong requiring him to "exhaust[] all administrative rights to appeal" the BOP's "failure . . . to bring a motion on [his] behalf." 18 U.S.C. § 3582(c)(1)(A). Courts and the government have recently considered the exhaustion requirements not to be waived but in fact satisfied where defendants, like Mr. Herod, are not presently in BOP custody and thus cannot seek relief from the BOP directly. In *United States v. Gentry*, No. 2:19-cr-78, Dkt. No. 98 (D.N.J. Apr. 5, 2020), the U.S. Attorney's Office for the District of New Jersey agreed that a defendant who was in federal custody but had not yet been designated to a BOP facility had effectively exhausted his administrative options under Section 3582(c)(1)(A). As the government stated in a letter to the

court, "BOP has informed this Office and [the defendant] that it won't move for a reduction in his sentence because BOP cannot evaluate [him] for compassionate release until he is in BOP's physical custody." *Id.* The government thus concluded that, "under these extraordinary circumstances, [the defendant] can fairly say that he has 'fully exhausted all administrative rights to appeal' BOP's 'failure'—through its conceded inability—'to bring a motion on' his 'behalf' for compassionate release." *Id.* The court later granted the defendant's motion. *See id.*, Dkt. No. 99 (D.N.J. Apr. 6, 2020).

At least two other courts addressing defendants in similar positions have agreed that BOP's inability or unwillingness to consider a defendant's request constitutes an effective exhaustion of administrative remedies. *See, e.g.*, *United States v. Jepsen*, No. 3:19-cv-73(VLB), 2020 WL 1640232 (D. Conn. Apr. 1, 2020) (finding that defendant's motion was "properly before the Court" because he "exhausted available appeals of the administrative denial of his request for compassionate release," noting that the defendant "is essentially caught in a 'Catch-22'" because he is designated to a non-BOP facility and "neither the warden at [that facility] nor the BOP will consider his request"); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, Dkt. No. 834 (E.D. Wash. Mar. 31, 2020) (finding that the defendant has "effectively exhausted her administrative remedies" where the BOP "indicated that the exhaustion of administrative appeals process was not applicable or possible").

Like the defendants in these cases, and like Ms. Janavs, Mr. Herod cannot exhaust his administrative remedies because the BOP will not consider his request while he remains outside a BOP facility. Surrendering to a BOP facility and attempting to fulfill the exhaustion requirements would quite literally be a life-threatening endeavor. And paradoxically, Mr. Herod would be

surrendering at a time when the BOP is releasing hundreds of inmates just like him: at-risk, non-violent offenders who are unlikely to recidivate, and who would be safer—and make prisons and communities safer—by serving their sentences in home detention.

Finally, and importantly, Mr. Herod's request for relief in these extraordinary circumstances implicates the Eighth Amendment's prohibition on "cruel and unusual" punishment. While Mr. Herod's nine-month prison sentence ordinarily would not give rise to concerns under the Eighth Amendment, the radically altered and potentially lethal conditions currently within BOP facilities present a clear and present danger to individuals like Mr. Herod who are in a high risk category for serious disease or mortality stemming from exposure to the COVID-19 virus.  These risks, in turn, raise the potential for Mr. Herod to suffer health and safety consequences from confinement in his designated BOP facility that would be "grossly disproportionate" to his underlying conduct. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In the context of the COVID-19 pandemic, the BOP's position that Mr. Herod must first surrender—thereby likely exposing himself to a deadly virus—in order to satisfy BOP exhaustion requirements, itself defies the Eighth Amendment's mandate that custodial officials not be "deliberate[ly] indifferent" to conditions that pose a substantial risk of serious harm. *Id.*; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (observing that the Eighth Amendment "require[s] a remedy" where jailors knowingly expose inmates to a risk of contracting serious infectious diseases, even if "it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed"). When prison officials with deliberate indifference expose a prisoner to a "serious, communicable disease that poses an unreasonable risk of serious damage to the prisoner's future health," there is an Eighth Amendment violation. *Myrick v. State of New Hampshire*, No. 05-CV-450-JD, 2006 WL 1424331, at *2 (D.N.H. May 18, 2006), citing *Helling* at 33-35. The Court in *Myrick* found that where the defendant alleged that he contracted Hepatitis B from food service

workers in the prison where he was incarcerated; his claim was a cognizable Eighth Amendment claim. *Myrick* at 3. Other Courts have addressed other contagious viruses, such as HIV/AIDS, and have suggested that "a prison's failure to protect prisoners from fellow inmates carrying AIDS may violate the Eighth Amendment." *Dunn v. White*, 880 F.2d 1188, 1195 (10th Cir. 1989), citing *Glick v. Henderson,* 855 F.2d 536 (8th Cir.1988). Overcrowding is another element of Eighth Amendment jurisprudence bearing on the COVID-19 pandemic. Where overcrowding negatively impacts the ability of prisons to provide adequate healthcare, and creates unsanitary and unsafe conditions, the prison violates prisoners' Eighth Amendment rights. *Brown v. Plata*, 563 U.S. 493, 502 (2011).

## CONCLUSION

Accordingly, for the reasons set forth herein, the Court should deem Mr. Herod to have satisfied the statutory exhaustion requirements or find that such requirements have been waived, and should allow him to begin serving his sentence in home detention. To hold otherwise would not only cause potentially irreparable harm to Mr. Herod, prison inmates and staff, and the larger community, but also defeat the purposes of Section 3582(c) and the ongoing efforts by Congress, the Attorney General, and the BOP to reduce the prison population in a safe and effective manner, and contain the pandemic. Mr. Herod therefore respectfully requests that, rather than continue his self-surrender date further at this time, the Court instead permit him to begin serving his sentence on May 15, 2020 in home detention.

Respectfully Submitted,
M. JAY HEROD
By and through counsel

Date: May 4, 2020

*/s/ Leonard E. Milligan III*
Leonard E. Milligan III
BBO #668836
MILLIGAN RONA DURAN & KING LLC
50 CONGRESS STREET, SUITE 600
BOSTON, MA 02109
t. 617.395.9493
lem@mrdklaw.com

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

I, Leonard E. Milligan III, hereby certify that counsel for Defendant conferred with counsel

for the government regarding this motion.

Date: May 4, 2020                               */s/ Leonard E. Milligan III*
                                                Leonard E. Milligan III


## **CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2020, I filed the foregoing with the United States District

Court for the District of Massachusetts using the CM/ECF system, and caused it to be served on all

registered participants via the notice of electronic filing.

Date: May 4, 2020                               */s/ Leonard E. Milligan III*
                                                Leonard E. Milligan III